# 23-6853-cr

IN THE

**United States Court of Appeals**

FOR THE SECOND CIRCUIT

———————

UNITED STATES OF AMERICA,

*Appellee,*

v.

MICHAEL SCHMITT,

*Defendant - Appellant.*

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

———————

**BRIEF FOR DEFENDANT-APPELLANT
MICHAEL SCHMITT**

**TIMOTHY P. MURPHY**
Federal Public Defender's Office
Western District of New York
300 Pearl Street, Suite 200
Buffalo, New York 14202
Telephone: (716) 551-3341
*Attorney for Defendant-Appellant
Michael Schmitt*

## **Table of Contents**

Table of Authorities.................................................................... iii

Jurisdictional Statement................................................................1

Issue Presented ..........................................................................1

Procedural History and Statement of Facts .........................................2

    A.   The allegations and guilty plea .................................................2

    B.   Mr. Schmitt's § 3553(a) factors and sentencing.........................3

    C.   Restitution ........................................................................7

         1. *Violet / At School series* ..............................................8

         2. *Henley / Blue Pillow 1 series* .......................................9

         3. *Jane / The Cinderblock Blue series* ..............................10

         4. *Lily / Vicki series* ...................................................11

Summary of Argument................................................................14

Argument................................................................................15

    I.   Four of the six restitution orders should be vacated. ...............15

        A.  Standards of review ....................................................15

        B. Child pornography restitution .........................................16

        C. Sections 2259(b) and (c) were violated ..............................21

            1. *Violet / At School series* ..........................................21

            2. *Henley / Blue Pillow 1 series* ....................................23

            3. *Jane / The Cinderblock Blue series* ..............................24

            4. *Lily / Vicki series* ..................................................27

        D. Conclusion ..............................................................29

Conclusion ..............................................................................30

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements ........................................ 31

# Table of Authorities

## Cases

*Paroline v. United States*, 572 U.S. 434 (2014)..........................14, 15, 16, 17, 18

*United States v. Aumais*, 656 F.3d 147 (2d Cir. 2011) ......................16, 17, 19

*United States v. Avenatti*, 81 F.4ᵗʰ 171 (2d Cir. 2023) ................................... 16

*United States v. Cadet*, 664 F.3d 27 (2d Cir. 2011)......................................... 15

*United States v. Desnoyers*, 708 F.3d 378 (2d Cir. 2013)............................... 16

*United States v. Gushlak*, 728 F.3d 184 (2d Cir. 2013)................................... 19

*United States v. Helmsley*, 941 F.2d 71 (2d Cir. 1991).................................. 16

*United States v. Jaffe*, 417 F.3d 259 (2d Cir. 2005)........................................ 15

*United States v. Pescatore*, 637 F.3d 128 (2d Cir. 2011).............................. 16

*United States v. Varrone*, 554 F.3d 327 (2d Cir. 2009)................................. 16

## Statutes

18 U.S.C. § 2252(a)(5)(B).......................................................................... 2

18 U.S.C. § 2252(b)(2) ............................................................................... 2

18 U.S.C. § 2259.................................................................................. *passim*

18 U.S.C. § 2259(B)..................................................................................... 18

18 U.S.C. § 2259(b)..................................................................................... 21

iii

18 U.S.C. § 2259(b)(2)(A)................................................... 17, 18, 20, 21

18 U.S.C. § 2259(b)(2)(B)......................................................17, 20, 21

18 U.S.C. § 2259(b)(2)(C)..........................................................20, 21

18 U.S.C. § 2259(b)(3) .................................................................. 19

18 U.S.C. § 2259(c) ...................................................................... 21

18 U.S.C. § 2259(c)(2)..............................................................17, 21

18 U.S.C. § 2259(c)(4)..............................................................17, 21

18 U.S.C. § 3231 ........................................................................... 1

18 U.S.C. § 3583(k) ...................................................................... 7

18 U.S.C. § 3663A ...................................................................... 19

18 U.S.C. § 3664 ........................................................................ 19

18 U.S.C. § 3664(e) .................................................................7, 16, 19

18 U.S.C. § 3742 ........................................................................... 1

28 U.S.C. § 1291 ........................................................................... 1

## Other Authorities

Amy, Vicky and Andy Act ("AVAA") .................................................. 16, 18

Mayo Clinic site, Gastroesophageal Reflux Disease (GERD), Overview,
    accessible at: https://www.mayoclinic.org/diseases-
    conditions/gerd/symptoms-causes/syc-20361940 ...................................28

iv

Mayo Clinic site, Scoliosis, Overview, accessible at:
https://www.mayoclinic.org/diseases-conditions/scoliosis/symptoms-causes/syc-20350716 ................................................................ 28

Mayo Clinic site, Von Willebrand disease, Overview, accessible at:
https://www.mayoclinic.org/diseases-conditions/von-willebrand-disease/symptoms-causes/syc-20354978 ............................................. 27

National Center for Missing & Exploited Children ("NCMEC")
https://www.missingkids.org/home ...................................................... 2

**Jurisdictional Statement**

A complaint, charging Michael Schmitt on September 10, 2019 with one count of possession of child pornography, triggered the subject matter jurisdiction of the United States District Court for the Western District of New York under 18 U.S.C. § 3231. A 2.[1] Mr. Schmitt pleaded guilty on December 10, 2024, to the same count, ultimately charged in an indictment, and was sentenced on July 13, 2023. A 11-12, 16-17, 20-21, 179. Two judgments, including a restitution order, were entered on July 21, 2023. A 179-192. A timely notice of appeal was filed on August 1, 2023. A 193. This Court enjoys jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

**Issue Presented**

Whether the District Court, when presented with claims consisting of often outdated, incomplete and insufficient information to establish losses under 18 U.S.C. § 2259, abused its discretion in

---

[1] Materials in the Joint Appendix will be cited as "A __ ."

imposing particular restitution amounts upon Mr. Schmitt regarding four separate child pornography victims.

## Procedural History and Statement of Facts

A. The allegations and guilty plea

On December 19, 2019, Mr. Schmitt was alleged in a one-count indictment to have possessed child pornography in violation of 18 U.S.C. §§ 2252 (a)(5)(B) and (b)(2). A 20-21. The District Court adopted the Probation Office's findings that the materials appellant possessed included 47 known victims[2] and over 600 image files containing more than 52,700 images. A 46-47, 86, 127; PSR[3] ¶ 46. Many of the files involved prepubescent females. PSR ¶¶ 25-34. Appellant had exchanged images with others, including teenage girls. PSR ¶¶ 18-19.

---

[2] This data, provided by the government, is from the National Center for Missing & Exploited Children ("NCMEC"). *See* https://www.missingkids.org/home (organization's official site, visited Sept. 6, 2024).

[3] The May 18, 2023 revised presentence investigation report, filed contemporaneously herein under seal, will be cited as "PSR __ ."

There were no allegations that Mr. Schmitt produced these materials. PSR ¶ 24.

On December 10, 2021, Mr. Schmitt pleaded guilty to count one pursuant to a written plea agreement, dated that same day. A 11-12, 22-36. The charge related to images found on Mr. Schmitt's cellular phone on July 22, 2019. A 20, 25, 45-47. The agreement recognized the court was required to order at least $3,000 for each identified victim, consistent with 18 U.S.C. § 2259. A 30.

A purported waiver of appeal was addressed at the time of the plea, which encompassed prison sentences not exceeding 97 months. A 27, 35. Restitution issues were not included in the waiver provisions of the plea agreement. A 35. Though referenced by the court on the record, no questions regarding the waiver were asked of Mr. Schmitt at the time of his plea. A 58-59.

B. Mr. Schmitt's § 3553(a) factors and sentencing

Thirty-year-old Michael Schmitt, who had never even been arrested prior to this case, PSR p. 2, ¶¶ 55-59, is a decorated combat veteran, medic and war hero. A 61-62, 139-130. His military service recognitions include his receiving the Inherent Resolve Campaign

3

Medal, the Army Commendation Medal, the Army Achievement Medal, the Army Good Conduct Medal, the National Defense Service Medal, the Global War on Terrorism Service Medal and the Expert Field Medical Badge. A 128-129.

Born in Texas, Mr. Schmitt's family moved around from state to state as his father served in the U.S. Air Force. A 119; SD[4] 1, 10. Appellant served our country in active combat in the Middle East for nearly six years, SD 12-14, enlisting in the Army as a 20-year-old. A 129; SD 12. After being deployed multiple times overseas, Mr. Schmitt was honorably discharged. A 120; SD 12-13; PSR ¶ 104.

During his service to our country, Mr. Schmitt suffered a traumatic brain injury. A 108-110, 113-114; PSR ¶ 94. As a result of his military service, he has further suffered from depression, alcohol abuse, suicidal tendencies, anxiety and post-traumatic stress disorder. A 64, 108-110, 120-121; SD 14-17; PSR ¶ 95. It was only *after* he sustained these life-changing combat-related injuries and illnesses that the present crimes were committed. A 129-130.

---

[4] Information referred to in the sealed documents appendix will be cited as "SD __ ."

4

Moreover, in the 44 months between Mr. Schmitt's arrest and sentencing, he complied with all terms of pre-trial supervision and underwent intensive treatment for his complex issues. A 114, 132; SD 14-17. As defense counsel eloquently described her client at sentencing:

> He was 20 years old when he enlisted in the Army. He couldn't wait to enlist. His father, grandfather, and those before him were all members of our military. By 23 years old, he had witnessed horrors that none of us in this room could imagine. I found it difficult reading both his letter to the Court and also his best friend's letter, Shawn Wilson, who is in the courtroom supporting him today. Those letters discuss not just some of the violence that Mr. Schmitt endured when he was overseas, but also discussed what that violence then does to a person once they return home to society. What he saw, the damage he was forced to do when he was there, and the fact that all of that was done on somebody who had barely reached the age of maturity, that is damage that is difficult to undo. And while he was overseas on March 31st, 2016, his life changed forever. He was physically and mentally fit. He was a young man who played football in high school when he went overseas. He was thrown into the air almost the length of a football field. He was almost killed. He suffered a traumatic brain injury, and, subsequently, was sent back home to New York State to us, where he was treated at a traumatic brain injury facility in Fort Drum, New York. He spent two years at that facility receiving treatment for this

5

> <u>TBI, and then he came home. And it's at that</u>
> <u>point that this criminal conduct begins and ends.</u>

A 129-130 (emphasis added); *see also* SD 1, 10-19.

Indeed, Mr. Schmitt was a model citizen for 4 years pending this case, working full time, while working on himself in the process. A 143. There is also no question as to Mr. Schmitt's remorse and shame, as he described for the District Court at sentencing:

> … Six years ago when I made the terrible decision that I did, I was a broken and defeated man. By the time I was arrested, I thought that suicide was my only option to escape the hell that I had put myself into, because I didn't know if I would be -- if I went to seek treatment, if I would just be arrested on the spot due to mandatory reporting laws. And, when I was arrested, I was thankful to the officers who came and got me when they told me that I would be put into counseling. I cannot put into words the regret that I feel for what I did, and it's a regret and shame that will never leave me. But all I can hope to do, moving forward, is to try to live my life as a better man.

A 144; *see also* A 119-121.

On July 13, 2023, the District Court adopted at sentencing the PSR finding of facts and Guidelines calculations of between 135 and

6

168 months.[5] A 124-127; PSR ¶¶ 15-35, 66. Having no arrest or criminal history, Mr. Schmitt landed in Criminal History Category I. A 52-53; PSR ¶ 55-62. He received offense points for the age of the victims, the possession of sadomasochistic images, the use of a computer and the number of images. A 50-51, 126-127. The government sought a range of between 78 and 97 months. A 144. The court sentenced Mr. Schmitt to 78 months in prison, to be followed by 7 years of supervised release. A 147, 180-181; *see also*, 18 U.S.C. § 3583(k).

C. <u>Restitution</u>

Restitution was ordered and bifurcated from the remainder of the sentencing. A 55, 57, 127. Five identified victims were addressed in the parties' restitution pleadings. A 97-99; SD 55-60. A sixth, not disputed on appeal, was only addressed during oral argument. A § 3664(e) restitution hearing was conducted on July 20, 2023, a week following sentencing. The victims were identified below with pseudonyms and

[5] Though the parties had bargained for a Guideline range of 78 to 97 months, the Probation Office disagreed. A 26-27, 51-53, 132-133, 136, 142; PSR ¶ 64.

7

phrases. What follows are the four victims ordered to receive restitution which are contested on appeal. All were overcompensated for various reasons:

### 1. Violet / At School series

Submissions for Violet were made from a psychologist, pediatrician and attorney. A 161. This victim previously had recovered $242,054[6] through 342 restitution orders. A 161-162; SD 223. She requested between $758,343 and $803,968, amounts driven by approximately $647,000 in "increased medical care." A 161; SD 55, 217, 223. This was in addition to more than $72,400 to $118,025 in counseling fees and over $47,400 in documentation expenses. SD 217, 223.

The victim's supporting documentation is outdated and unpersuasive. Based on a 2016 psychological report (when Violet was 10 years old), she was unaware of the distribution of her images. SD 241-242. The victim briefly saw a therapist in 2014, but ceased

---

[6] For simplicity's sake, the financial amounts in this brief will not include amounts under a dollar. For instance, $242,054.60 will be referenced as $242,054.

counseling that same year, with no indication of returning. SD 235-237. The 2016 report further indicates there was no need for regularly scheduled appointments. SD 246. With no information that she had re-engaged with therapy, the projected cost for future therapy sessions is, in the words of the report itself, "at best, speculative." SD 247.

The court, however, found the balance owed in prior restitution orders to be $571,186. $10,000 dollars was awarded, which is what the victim requested. A 161-162.

### 2. *Henley / Blue Pillow 1 series*

The victim provided information regarding posttraumatic stress disorder, depression, anxiety and hyperactivity disorder. A 163. She had recovered $315,244 to date. A 98, 163; SD 56. According to the government, there was an outstanding balance of $1,848,755. A 98, 164.

The court's finding on the victim's loss is suspect. According to Henley's expert report, the current total aggregate loss was between $75,500 and $116,500. SD 106. However, the court erroneously believed the range was between 105,500 and 146,500. A 163. Moreover, Henley's intentions regarding her undertaking any future counseling

appeared to be at best "ambivalent," as she "resist[ed]" the idea of "needing therapy." SD 98.

The victim asked for $5,000. A 163; SD 62. The government requested $10,000. A 163. The court ultimately awarded $5,000. A 163-164.

### 3. *Jane / The Cinderblock Blue series*

The victim presented reports from a psychologist and economist. A 165. Jane had received to date $256,534 in restitution payments. A 98, 165. She requested no less than $3,000 in restitution. A 165; SD 110. Of the amount requested, $1,708,639 was for "the reduction in 'value of life.'" A 165; SD 113.

Jane's request depended on a shaky premise. While the District Court opined the expert reports were reasonable, A 165-166, the government relied on an economics report assuming that Jane, had she not been traumatized, would have gone on to college and made almost $4 million in her lifetime. SD 162. Calculating restitution this way assumed Jane was not intending to pursue college as a result of the online images. But a psychological evaluation conducted on December 30, 2014, when she was 12, SD 129-145, considered Jane's school

records which indicate that "[h]er performance across all grades was positive, with no behavioral concerns noted. She did receive an occasional C or D in her courses, but overall, received A's and B's." SD 131-132. Moreover, during her evaluation Jane indicated she "likes school and is doing well in her classes," saw herself working in various professions, and opined going to college "sounds fun." SD 138, 140.

The court concluded the purported aggregate loss was between $4,453,993 and $7,749,603. A 165; SD 115. According to the government, there was an outstanding balance from prior restitution orders of $10,229,475. A 98, 166. The court ordered $10,000; the amount requested by the government. A 165-166.

### 4. *Lily / Vicki series*

The victim provided documentation of her medical impairments, including posttraumatic stress disorder, insomnia and other chronic conditions. A 168. Lily had already received $2,584,043 in restitution payments. A 98, 167. The loss was alleged to be between $5,990,036 and $6,008,536. A 167; SD 58, 485, 493. This was largely based on: (1) $4,751,515 in "increased medical costs," (2) approximately $53,000 in education and vocational counseling needs, (3) approximately $936,000

11

in lost past and future earnings, and (4) approximately $102,000 in costs for restitution documentation. SD 485, 490-493.

A number of Lily's reported medical conditions had no connection to appellant's crime. For example, Lily apparently suffers from Von Willebrand's Disease, a clotting disorder. SD 490. Despite this being a condition that is commonly inherited, the projected costs presented by the victim for this disorder ranged from $87,000 to $367,000. SD 515-517. Similarly, there is a projected cost of $1.1 million for a "complex partial seizure disorder." SD 515, 518-519. Then there's the $325,550 of estimated lifetime costs for degenerative spine / scoliosis, SD 516, 521-523, and the $235,345 for Gastroesophageal Reflux Disease ("GERD"), SD 514, 516, 522-523. Missing, however, was any attempt to tie the continued distribution of Internet images of Lily to her increased medical costs.

There had been 1,511 previous restitution orders issued, with a balance of $3,424,492. A 168; SD 485. The government requested $10,000, A 167, as did the victim. SD 484, 492. The court opined the projected amount was reasonable, ultimately ordering $7,500 in restitution. A 167-168.

12

*****

Restitution for two other identified victims is not at issue on appeal. With regards to the "April Blonde" series, Mr. Schmitt conceded below that the victim adequately documented a restitution request. A 174. April submitted a report from her *current* therapist, as well as documents showing costs already incurred and estimates for ongoing treatment. The victim asked for $5,000. A 169. The government asked for $10,000. A 169. The defense conceded restitution was mandatory but argued that $3,000 was appropriate. A 169-170. The court issued a $5,000 order. A 170. Finally, the defense learned about victim "Tara" for the first time at the restitution hearing. A 170-171. $3,000 was stipulated by the parties and thus ordered by the court. A 171-174.

Here is a breakdown of the restitution amounts:

| Victim ID Name | Amount requested by victim | Amount requested by government | Appellant's position below | Court's order (judgment) |
|---|---|---|---|---|
| | | | | |
| 1.  Violet | $10,000 | $10,000 | Object | $10,000 |
| | | | | |
| 2.  Henley | $ 5,000 | $10,000 | Object | $ 5,000 |
| | | | | |
| 3.  Jane | $ 3,000 *(at least)* | $ 10,000 | Object | $10,000 |
| | | | | |

| 4. Lilly | $ 5,000 | $10,000 | Object | $ 7,500 |
|---|---|---|---|---|
| | | | | |
| 5. April | $ 5,000 | $10,000 | Consent *(to $3,000)* | $ 5,000 |
| | | | | |
| 6. Tara | n/a | $ 3,000 | Consent | $ 3,000 |

A 174-175, 191.

## Summary of Argument

Some issues seem to impel only a 30,000-foot view of things. A victim of child pornography speaks of thousands of dollars in purported losses but only seeks a few thousand in restitution. No harm, no foul. But while restitution is a component of sentencing, it is not a tool for punishment. It's only purpose is to make victims whole.

In Mr. Schmitt's matter, most of the ordered restitution falls far short of the basic norms for causation and relevant supporting data -- ranging from incorrect math to inflated estimates of future losses. The government's requests failed to establish actual losses. The applications, though presented by private counsel, were inconsistent and, at times, outdated. While the Supreme Court in *Paroline* reinforced the principal that possessing child pornography is not a victimless crime, *Paroline v. United States*, 572 U.S. 434, 446-448 (2014), the government was still responsible under 18 U.S.C. § 2259 for

presenting contemporaneous and complete evidence of loss caused by Mr. Schmitt's conduct.

In sum, the District Court ordered restitution for six individuals, failing to hold the government to its evidentiary burden for four of them.

## Argument

### I.    Four of the six restitution orders should be vacated.

The District Court illegally ordered restitution for four victims of child pornography, as there was insufficient evidence under *Paroline* and § 2259 to establish actual losses connected to Mr. Schmitt's conduct. Under the circumstances, this Court is compelled to vacate these orders and remand to the District Court.

### A.  Standards of review

"In the case of restitution orders, [this Court] review[s] issues solely of law *de novo*, findings of adjudicative fact for clear error, and the multi-factor balancing aspects of such an order for abuse of discretion." *United States v. Cadet*, 664 F.3d 27, 34-35 (2d Cir. 2011), citing *United States v. Jaffe*, 417 F.3d 259, 263 (2d Cir. 2005); *see also,*

15

*United States v. Avenatti*, 81 F.4th 171, 203 (2d Cir. 2023); *United States v. Desnoyers*, 708 F.3d 378, 388-389 (2d Cir. 2013).

District courts have no inherent authority to order restitution. *United States v. Helmsley*, 941 F.2d 71, 101 (2d Cir. 1991). It may be ordered only for losses caused by an offense of conviction, *United States v. Varrone*, 554 F.3d 327, 333 (2d Cir. 2009), and only when authorized by statute. *Helmsley*, 941 F.2d at 101; *United States v. Pescatore*, 637 F.3d 128, 139 (2d Cir. 2011). The government has the "burden of determining the amount of the (victim's) loss." *See*, 18 U.S.C. § 3664(e). Victims are not entitled to amounts "in excess of their losses" or "in excess of that authorized by statute." *Pescatore*, 637 F.3d at 139 (internal citations omitted).

## B.   Child pornography restitution

Child pornography restitution is governed by 18 U.S.C. § 2259, *Paroline v. United States*, 572 U.S. 434 (2014) and the Amy, Vicky and Andy Act ("AVAA"), which revised § 2259 in 2018 to conform with *Paroline*.

In *Paroline*, the Supreme Court modified this Court's *Aumais* proximate cause requirement, holding that restitution is appropriate in

16

an amount "that comports with the defendants' relative roles in the causal process that underlies the victim's general losses." *Paroline*, 572 U.S. at 458-459; *United States v. Aumais*, 656 F.3d 147, 153-154 (2d Cir. 2011). Still, the victims' losses must be connected to the defendant's conduct. *See*, 18 U.S.C. §§ 2259(b)(2)(A) (addressing amounts reasonably projected "as a result" of the criminal conduct); (b)(2)(B) (addressing the defendant's "relative role in the casual process" underlying the losses); (c)(2) (addressing costs reasonably projected "as a proximate result" of the criminal conduct) and (c)(4) (defining victims as being harmed "as a result" of the criminal conduct).

Restitution considerations include, "as a starting point," the "amount of the victim's losses caused by the continuing traffic in the victim's images." *Paroline*, 572 U.S. at 460. With the understanding that restitution "should not be severe," the *Paroline* factors include:

1. The number of past criminal defendants found to have contributed to the victim's general losses;

2. Reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;

17

3. Any available and reasonably reliable estimate of the broader number of offenders involved;

4. Whether the defendant reproduced or distributed images of the victim;

5. Whether the defendant had any connection to the initial production of the images;

6. The number of images of the victim the defendant possessed; and

7. Other relevant facts regarding the defendant's relative causal role.

*Paroline*, supra at 459-460.

Enacted in 2018, post-*Paroline*, the AVAA included a restitution floor of $3,000. Thus, *if*, after conducting a *Paroline* analysis, the sentencing court finds a causal significance with the defendant's conduct in producing the victim's losses, the resulting award of restitution may not be less than $3,000. *See* 18 U.S.C. §§ 2259(b)(2)(A) and (B).

The "central concern of the causal inquiry must be the conduct of the particular defendant from whom restitution is sought," *Paroline*, 572 U.S. at 445, which incorporates "the bedrock principle that restitution should reflect the consequences of the defendant's own conduct, not the conduct of thousands of geographically and temporally

18

distant offenders acting independently, and with whom the defendant had no contact." *Id.* at 455. The causal link for ordering restitution must not be simply factual, but rather proximate, meaning there must be a sufficient connection between the offense and the victim's costs. *Id.* 443-458. This proximate cause requirement prevents a defendant from being held liable where the link between the offense and the alleged harm could be best described as coincidental. *Id.* at 444-445.

Because § 2259(b)(3) incorporates 18 U.S.C. § 3664,[7] the burden of proof is on the government to prove that a particular restitution amount is appropriate under § 2259 by a preponderance of the evidence. *See* 18 U.S.C. § 3664(e); *see also*, *Aumais*, 656 F.3d at 152; *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013).

The District Court is required to analyze child pornography restitution under a two-prong approach. First, as a precondition of *any* restitution order, the court must determine the full amount of the victim's losses that were incurred or are *reasonably projected* to be

---

[7] *See*, 18 U.S.C. § 3664 ("An order of restitution under this section shall be issued and enforced in accordance with [18 U.S.C. § 3664] in the same manner as an order under [18 U.S.C. § 3663A]")

incurred. 18 U.S.C. § 2259(b)(2)(A). It is only after the court makes this initial determination that it may move to the second prong, which is to "order restitution in an amount that reflects that defendant's relative role in the casual process that underlies the victim's losses, but which is no less than $3,000." 18 U.S.C. § 2259(b)(2)(B). In other words, before reaching the mandatory restitution portion of the statute, the District Court must first determine whether the victim's losses can be calculated in a reasonably reliable way.

Moreover, even if past or future losses are established by a preponderance of the evidence, the court may only order restitution *if* the victim's "total aggregate recovery" does not exceed the full amount of the victim's demonstrated losses. 18 U.S.C. § 2259(b)(2)(C). Put another way, once a victim has been fully compensated for a proven loss amount, no restitution order may be entered against new defendants.

Restitution in child pornography cases include "the full amount of the victim's losses," including: medical services related to physical, psychiatric or psychological care; physical and occupational therapy or rehabilitation; necessary transportation; temporary housing and

childcare expenses; lost income; attorneys' fees; other costs incurred; and any other losses suffered by the victim as a proximate result of the offense. 18 U.S.C. § 2259(c)(2).

### C. Sections 2259(b) and (c) were violated

Four of the six identified victims presented inflated, outdated, and often unrealistic, restitution requests. The restitution amounts were based on insufficient evidence of actual losses that appellant proximately caused. *See* 18 U.S.C. §§ 2259(b)(2)(A), (b)(2)(B), (c)(2) and (c)(4). Further, certain amounts were also illegal, as legitimate damages claimed were exceeded by what had already been paid to the victims. *See*, 18 U.S.C. § 2259(b)(2)(C).

#### 1. *Violet / At School series*

A number of factors undermine the court's restitution order of $10,000. Based on a psychological report from when the victim was just 10, Violet was unaware of the distribution of her images. SD 241-242; *see also*, SD 219 (observing victim was still unaware in 2021). Though briefly seeing a therapist in 2014, Violet ceased counseling that same year, with no indication of returning. SD 235-237. The 2016 report further indicates there was no need for regularly scheduled

21

appointments. SD 246. With no information that she had re-engaged with therapy, the projected cost of between $72,000 to $118,000 for future therapy sessions is, in the words of the report itself, "at best, speculative." SD 247.

Moreover, the District Court erroneously concluded the appellant had "asserted" that $315,244 had already been paid to victim Violet. A 161. This was the amount agreed upon by the parties with regards to what *victim Henley* had already received. A 98; SD 56. This error occurred despite the government asserting that *victim Violet* had received $242,054 to date. A 97. Further, as the District Court accepted the high end of the victim's claimed damages ($803,968, A 161), when reduced by the $242,054 already recovered, SD 227, the amount would only have been $561,914, and not $571,186, as the court calculated. A 162.

Finally, Violet's 2021 submission seeking future counseling costs was speculative, as were the financial requests regarding the victim's anxiety, PTSD, insomnia and ADHD conditions, SD 217, 227, as they contradicted the victim's submitted 2016 psychological report, which concluded Violet "does not meet criteria for a clinical disorder." SD 243.

Even the 2017 report from Dr. Cooper, relied on in part in the 2021 submission, SD 220-221, acknowledged that Violet was unaware of any images being posted online. SD 371.

### 2. *Henley / Blue Pillow 1 series*

The government requested "the defendant pay $10,000, or in the alternative, an amount no less than $3,000 to this victim." A 98. The high end of this request sought $5,000 more than the victim sought. According to Henley's expert report, the current total aggregate loss (confined to potential counseling sessions) was between $75,500 and $116,500. SD 106. However, the court erroneously concluded the range was between 105,500 and 146,500. A 163. Even if these numbers had been properly tabulated, Henley's intentions regarding her undertaking any future counseling appeared to be at best "ambivalent," as she "resist[ed]" the idea of "needing therapy." SD 98.

Further, the District Court seemed to accept Henley's assertion of turning down modeling opportunities because of her images being posted online, SD 64, 72, as a reasonable projection to support an additional loss of at least $500,000 for "additional medical and occupational losses" and "legal fees." A 163-164. Yet Henley's attorney

acknowledged, "[w]e do not yet have an evaluation by a vocational economist, but anticipate obtaining one in the future…" SD 64. The fact that the victim's counsel "expect[ed]" this yet-to-be-completed "evaluation [to] support a larger restitution request," SD 64, is hardly a valid basis to support a criminal restitution order.

The government asserted, and the court accepted, that Henley had already recovered $315,244, A 98, 163, an amount almost $200,000 more than her *documented* anticipated losses. SD 106. Finally, the purported $1.8 million outstanding balance, asserted by the government, A 98, was not supported by the documentation submitted by the victim. SD 62-108.

### 3. *Jane / The Cinderblock Blue series*

The court opined Jane's expert reports, estimating over 7.7 million in lifetime damages, were reasonable. A 165-166. Of the total amount requested, (1) $101,027 was for treatment and counseling, A 149, (2) $3,939,937 was for "lost wages and benefits as a result of her abuse and ongoing exploitation," and (3) $1,708,639 was for "the reduction in 'value of life.'" SD 113.

24

Jane's economics report presents three scenarios for her purported loss of future earnings, with the victim's lawyer of course requesting the highest amount, totaling $3,939,937. SD 162. This amount speciously assumes that Jane, had she not been traumatized, would have gone on to college and made almost $4 million in her lifetime. SD 162. Calculating restitution this way unfairly *assumed* Jane was not intending to pursue college as a result of the online images. One of the documents relied on in reaching this "expert" conclusion is a psychological evaluation conducted on December 30, 2014. SD 129-145. Therein, the doctor (also hired by the victim) reviewed Jane's school records which indicate that:

> [h]er performance across all grades was positive, with no behavioral concerns noted. She did receive an occasional C or D in her courses, but overall, received A's and B's. Indeed, during the 2014-2015 school year Jane received 2 As, 1 B, and 3 Cs during the first quarter; as of the middle of the second quarter she had brought her grades up to all As and Bs.

SD 131-132. Moreover, during her evaluation Jane indicated that: (1) she "likes school and is doing well in her classes," (2) she sees herself working in various professions, and (3) she opined going to college "sounds fun." SD 138, 140.

There is little to substantiate the restitution request for Jane. The victim's supporting economic documentation was drafted years prior to sentencing. SD 129, 146. At the time of Jane's 2014 psychiatric and 2015 economic reports, she was in high school, meaning she would be workforce-age at the time of appellant's 2023 sentencing. The restitution packet included no details as to what Jane's *current* life was presently like. For all we know, today she may be a financially successful professional. As Jane, like all of the identified victims, had legal counsel seeking restitution on her behalf, there's no excuse for the government submitting stale information. The unpersuasive allegations in the economist's report notwithstanding, the District Court could not, without contemporaneous facts, reasonably conclude by a preponderance of the evidence Jane's actual future loss amount. This stale report, A 165, should have carried little weight with the court.

Further, the court opined the purported aggregate loss was between $4,453,993 and $7,749,603. A 165; SD 113. While the $7.7 million number is found in Jane's attorney's letter, SD 113, the $4.4 million number is nowhere in the victim's documentation or in the

government's memo. A 98. According to the government, there was an outstanding balance from prior restitution orders of $10,229,475. A 98, 166. This unexplained $10.2 million balance asserted by the government and accepted by the court, however, exceeds the otherwise maximum aggregate loss, SD 113, and is not supported by the victim's application.

### 4. *Lily / Vicki series*

Lily's report acknowledged: "we do not claim that this defendant caused the underlying conditions," but the "continued downloading and distribution of her images causes an exacerbation and lengthening of these conditions and complicates treatment." SD 489. The latter part of this statement is unsupported by its exhibits. For instance, Lily apparently suffers from Von Willebrand's Disease, a clotting disorder. SD 490. Despite this being a condition that is commonly inherited,[8] the projected costs presented by the victim for this disorder were

---

[8] *See*, Mayo Clinic site, Von Willebrand disease, Overview, describing condition as "a lifelong bleeding disorder in which your blood doesn't clot properly," accessible at: https://www.mayoclinic.org/diseases-conditions/von-willebrand-disease/symptoms-causes/syc-20354978 (site visited, Oct. 11, 2024).

approximately $367,000 (should hospitalization result) or $87,000

otherwise. SD 515-517. Why would appellant be responsible for this?

Similarly, there is a projected cost of $1.1 million for a "complex

partial seizure disorder." SD 515, 518-519. Then there's the $325,550 of

estimated lifetime costs for degenerative spine / scoliosis,[9] SD 516, 521-

523, and the $235,345 for Gastroesophageal Reflux Disease

("GERD"),[10] SD 514, 516, 522-523. As with the myriad of other medical

conditions described in Dr. Cooper's report, there is no apparent

attempt to tie the continued distribution of Internet images of Lily to

her increased medical costs -- associated with, for example, her clotting

or seizure disorders. A 167-168; SD 515-523. Moreover, estimates of

Lily's medical costs wildly vary between reports, with Dr. Cooper

---

[9] *See*, Mayo Clinic site, Scoliosis, Overview, describing condition as "a sideways curvature of the spine that most often is diagnosed in adolescents," accessible at: https://www.mayoclinic.org/diseases-conditions/scoliosis/symptoms-causes/syc-20350716 (visited, Oct. 11, 2024).

[10] *See*, Mayo Clinic site, Gastroesophageal Reflux Disease (GERD), Overview, describing GERD as "a condition in which stomach acid repeatedly flows back up into the tube connecting the mouth and stomach, called the esophagus," accessible at: https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940 (site visited, Oct. 11, 2024).

estimating the cost of care related to the seizure disorder at $437,580 in one statement, SD 584, but $1.1 million elsewhere. SD 523.

Accordingly, Lily's $4,751,515 purported loss amount projected for medical costs, SD 485, 490, 523, is inherently unreliable. In light of the $2.5 million Lily had already received in aggregate recovery, A 98, her request failed to establish that actual losses (past or future) exceed the amount she has already recovered.

### D. Conclusion

The government shouldered the statutory burden of presenting sufficient evidence to support the above claimed restitution amounts being Mr. Schmitt's responsibility. Instead, the District Court was offered (and accepted) outdated, incomplete and, often speculative information about the victims. In sum, the government's burden was not met.

## **Conclusion**

This Court should vacate four of the six restitution orders, as argued herein, and remand to the District Court for further proceedings.

Dated:     December 9, 2024
                 Buffalo, New York

                                   Respectfully submitted,

                                   **/s/ Timothy P. Murphy**
                                   Timothy P. Murphy
                                   Federal Public Defender's Office
                                   Western District of New York
                                   300 Pearl Street, Suite 200
                                   Buffalo, New York 14202
                                   Telephone: (716) 551-3341

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

UNITED STATES OF AMERICA,                    **23-6853-cr**

       Appellee,

    v.

MICHAEL SCHMITT,

       Defendant-Appellant.

_____

1.    This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because:

■    this brief contains 5,146 words, excluding the parts of the brief exempted by Fed.R. App.P. 32(a)(7)(B)(iii), _or_

☐    this brief uses a monospaced typeface and contains [_state the number of_ ] lines of text, excluding the parts of the brief exempted by Fed.R.App.P.32(a) (7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5)and the type style requirements of Fed.R. App.P. 32(a)(6)because:

■ this brief has been prepared in a proportionally spaced typeface using Century Schoolbook in size 14 font,

*or*

□ this brief has been prepared in a monospaced typeface using Microsoft Word 2013 with _____.

Dated: December 9, 2024
Buffalo, New York

Respectfully submitted,

**/s/ Timothy P. Murphy**
Timothy P. Murphy
Federal Public Defender's Office
Western District of New York
300 Pearl Street, Suite 200
Buffalo, New York 14202
Telephone: (716) 551-3341